Filed 11/13/20  In re Madison M. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Madison M., a Person Coming Under the Juvenile Court Law. | B300137 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>C.M.,<br><br>     Defendant and Appellant;<br><br>C.B.,<br><br>     Defendant and Respondent. | Los Angeles County Super. Ct. No. CK93381A |

APPEAL from an order of the Superior Court of Los Angeles County, Pete R. Navarro, Judge Pro Tempore of the Juvenile Court.  Affirmed.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Respondent.

No appearance by Plaintiff and Respondent.

———————————

C.M. (father) appeals from a juvenile court order denying his petition under Welfare and Institutions Code section 388, requesting custody of his nine-year-old daughter Madison M., who had been under the legal guardianship of her maternal grandparents for more than five years. We affirm.

## BACKGROUND

### 1. *The 2012 petition and 2014 guardianship*

Madison was two years old on May 8, 2012, when the Los Angeles County Department of Children and Family Services (DCFS) filed a petition under Welfare and Institutions Code section 300, subdivision (b).[1] The petition alleged father and C.B. (mother) endangered Madison by having a drug pipe with residue in the home and within Madison's reach. Hallucinogenic mushrooms and marijuana were in father's parked car. Mother and father used marijuana, which made them periodically incapable of caring for Madison. They were in jail following their May 3 arrests for child endangerment and possession and transportation of a controlled substance.

The juvenile court found father was Madison's presumed father and detained Madison, placing her with her maternal

_____

[1] All statutory references are to the Welfare and Institutions Code.

2

grandparents Lori and Arthur a week after the petition was filed. Both mother and father filed waivers of rights submitting the petition on the social worker's reports and documents. The court sustained the petition on July 3, 2012, removed Madison from mother and father, and ordered reunification services and monitored visitation.

At the six-month review hearing in January 2013, the court found father compliant with the case plan, continued reunification services, and gave DCFS discretion to allow him two hours a week unmonitored visitation.

In February 2013, the court allowed both parents unmonitored visitation, giving father one hour three times a week for two weeks, and then two hours with discretion to liberalize, on the condition he remained compliant and tested clean. Lori and Arthur reported when he did visit, father was inattentive to Madison, and she did not show interest in being with him.

In July 2013 father was in partial compliance and had recently been arrested for possession of marijuana for sale. His unmonitored visits had been stopped, and his monitored visits had not been consistent.

In September 2013, both mother and father were in partial compliance. Father stopped participating in AA/NA meetings, missed drug tests, and had not shown completion of parenting and substance abuse programs. Madison was doing well with Lori and Arthur, who wanted legal guardianship with the goal of adoption. DCFS recommended the court terminate family reunification services, with monitored visits for father. At the

12-month review hearing on September 16, 2013, the court terminated reunification services and set a section 366.26 hearing, giving the parents notice of the right to seek writ relief.

At the section 366.26 hearing on January 14, 2014, father and mother were present with counsel.  DCFS reported four-year-old Madison was developmentally on target, attended preschool, and was happy and comfortable with Lori and Arthur.  Mother had failed to contact the social worker and stopped drug testing in October 2013, so her unmonitored visitation had been changed to monitored.  Father attended sporadic monitored visits and did not seem closely bonded with Madison.  DCFS recommended a permanent plan for Madison of legal guardianship by Arthur and Lori, who planned to move to their second home in Arizona.

The court terminated jurisdiction and ordered guardianship for Madison with Arthur and Lori, with monitored visitation for mother and father.  The court did not terminate parental rights.  Guardianship papers were filed that day.

2. ***The 2019 section 388 petitions***

Five years and three months later, on April 14, 2019, Father filed a section 388 petition requesting the court change the guardianship order.  Lori and Arthur, who now lived with Madison in Arizona, were getting a divorce, and Lori might move to Alabama.  He had improved himself and had a career.  He wanted custody of Madison because it would be more stable, and allow her "to grow as a youth" because her guardians' ages were holding her back.

Mother, who now lived in Arizona, also filed a section 388 petition on May 6, 2019.  She requested termination of the guardianship and reunification with Madison, because Lori

4

wanted to move Madison to Alabama. Mother had other children living with her and Madison wanted to come home.

Arthur filed a section 388 petition on July 2, 2019. He and Lori were getting a divorce and he wanted to maintain sole legal guardianship of Madison, who was settled and thriving in Arizona. Arthur wanted legal custody with visitation rights for the parents and Lori. Mother, who lived 40 minutes away, wanted Madison to stay in his care.

Lori's section 388 petition, filed July 15, 2019, explained she and Arthur were divorcing, she was moving to Alabama, and Madison did not want to relocate. Lori wanted to relinquish her legal guardianship of Madison, who wanted to stay with Arthur. Lori added that mother was a recovering drug addict and alcoholic who continued to drink and smoke daily. Mother was responsible for three other children, who were dirty and neglected, and her live-in boyfriend was an alcoholic and former gang member. Madison did not want to live with mother.

In a DCFS interim review report filed July 17, 2019, father stated he had completed a drug program required for criminal court and was no longer on probation. (The agency was unable to verify father's completion because the program shredded its records after five years.) Father had worked for seven months (since December 2018) at the local electrician's union, which did random drug testing of its employees. He had a one-year-old son and a two-year-old daughter with his partner Coelina, who had a master's degree in early childhood special education and worked at night as a waitress. Coelina stated father had been sober ever since she met him six years earlier. They lived with the two young children in a two-bedroom, two-bath apartment.

Asked why he had not regained custody of Madison after complying with the dependency court orders, father said he had been homeless and sleeping in his car and knew Madison would have a better life with Lori and Arthur. He had been unable to visit Madison in Arizona because it was expensive. He had stayed home for the first year of his new daughter's life. He and Coelina visited Madison at Christmas a few years ago. He was happy to be able to give her Christmas gifts, but felt awful that she didn't like them. He FaceTimed with Madison once a week, and when Lori visited California she let father have a day visit or dinner with Madison. (The social worker then called Lori, who was visiting California, and she allowed Madison to have an overnight visit at father's home.)

Father's plan was for Madison to attend an afterschool program, and he would pick her up after work; during the summers, Coelina was home during the day. Father had made mistakes, was trying to improve, and wanted a "fair share" to be a father. He had his GED, a job, and six years of sobriety.

Lori told the social worker she recently stayed with mother and saw her drink beer in the morning. The house was filthy, there was no food, and the children were unsupervised. Mother hit Lori while she was driving with Madison in the car, leaving bruises on Lori's arms. The police were called. Arthur "was an asshole as a husband but he is a good father." Father never made time for Madison, visiting only once in Arizona and when Lori and Madison were in California often saying he was busy. Nevertheless, Lori would rather father have custody of Madison than mother. But "Madison has all kinds of questions. She wants to know why her dad wants her now."

Madison told the social worker she did not want to live with mother, who drank beer and smoked when she drove, and didn't make Madison wear a seat belt. On mother's birthday, mother had five beers at a pizza place and tried to snatch the keys from Lori, hitting her and causing bruises. Madison told the police what happened. Madison was sad Lori and Arthur were divorcing, and she wanted to live with Arthur, who bought her a cat she talked to when she was sad. When Arthur couldn't get a babysitter he let Madison go to mother's house, where mother stayed in her room and did not watch or discipline the kids. Mother's late husband was a good person who hung himself. Before that, mother did not drink, she just smoked.

DCFS recommended the court grant father's and Lori's petitions and deny mother's and Arthur's petitions, and order individual counseling for Madison and joint counseling for father and Madison. Father's home was appropriate and DCFS believed he had completed his programs, "or he would still be on probation." Father wanted the chance to raise Madison and knew he would have to work on his relationship with her.

3. ***The hearing on the section 388 petitions***

The juvenile court heard all four section 388 petitions at a hearing on July 26, 2019, with father, mother, Arthur, and Madison present and represented by counsel. Lori was also present, and the court granted her petition to be relieved as guardian.

Father's counsel argued he had made marked improvement and had completely addressed the issues in the 2012 dependency case. He was no longer on probation, was gainfully employed working for a union, and was raising two other children. The court asked: "[T]hat's a good thing that father's circumstances

have changed. But . . . how is it in this child's best interest that the guardianship be terminated and it be a change of placement?" Counsel responded the original purpose of the guardianship was permanency and stability for Madison, which father could now provide. He had been in contact with Madison through Lori, had visited, and "[t]hey have definitely been working to establish their bond." It was in Madison's best interest to establish a relationship with her two half-siblings.

Madison's counsel disagreed. Father had not shown it was in Madison's best interest to be returned to him. She had been living with Arthur for seven years (since 2012), academically she was at the top of her class, all her friends were in Arizona, and she wanted to stay with Arthur.

Mother's counsel withdrew her section 388 request for custody of Madison, and mother joined in Arthur's request that Madison remain with him.

At DCFS's request, Lori testified she had cared for Madison since she was three months old, and she and Arthur had joint guardianship. They had discretion whether to allow mother or father to visit, and there were several years when neither parent had unsupervised contact with Madison. Lori had no safety issues with father's care of Madison, but had "educational safety issues" about where she would go to school. Lori's concern was that Arthur let Madison spend the night with mother. When Lori picked Madison up the next day, mother was drunk, they argued, and a physical confrontation followed. Arthur was a very good father and grandfather, he loved Madison, and if the court told him not to allow Madison unsupervised contact with mother, he would abide by the order. Asked what she thought was in Madison's best interest, Lori replied Madison wanted to go back

8

to Arizona with Arthur, and she had no concerns if Madison was not left alone with mother.

Lori had been in California with Madison for a month while going through the divorce. Madison had her first two overnight visits with father, which she seemed to enjoy. Madison and father had a good relationship now. Father had visited Madison in Arizona only once in seven years, and called once a month. He provided no financial support.

Father testified he had visited once for Christmas when Arthur and Lori first moved with Madison to Arizona, and the visit went well. He tried to get in touch with Madison once a week, but most of the time it was once a month. Father offered financial support but Lori and Arthur said they could handle it and did not want to put him in a bind. He wanted a chance to be a father, to hear Madison say, "[T]hat's my dad and I'm proud of him." He would allow her to visit Lori and Arthur. He knew where Madison went to daycare, but did not know what school she went to last year. Father's young children were two and almost one, and he had gone back to work after spending a year at home with the two-year-old.

Father's counsel asked the court to grant his section 388 petition. Father had showed a change of circumstances. He had financial stability and the opportunity to parent two other children, giving him the skills and tools to parent and raise Madison. Father filed as soon as he was completely stable and ready to take on a nine-year-old. He would encourage and facilitate visits with both Lori and Arthur. DCFS did not recommend the case be closed, so father would be supervised as he began the transition with Madison.

Counsel for DCFS agreed. Father had changed his circumstances and had ameliorated his issues. Father had Madison's best interest at heart and had maintained a relationship with her. His small children seemed to be safe and doing well. It would be in Madison's best interest to transition to father's home. Although Madison had lived in Arizona for some time and attended school there, "she's nine. And while disrupting a child's schooling is difficult and is going to be a transition, at this point, it's summertime and a new school year will begin relatively soon. And it wouldn't be totally inappropriate for the child to begin a different school environment next year with her father, given the changes and the progress that he's made." Arthur's section 388 petition should be denied. Lori had testified she had concerns about mother, and Arthur had allowed mother unmonitored contact with Madison, who would therefore be at risk in Arizona. If the court did grant Arthur's petition, DCFS asked the new guardianship papers require appropriate childcare, monitored contact with mother, and no overnight visits.

The court stated: "The key word here [is], 'stability.' This child has been stable. She's doing well. And . . . some of the adults are suggesting that we rip this child away from her home, her community, her school because it's in the best interest of the parents, not for the child but for the parents. That's what I'm hearing. That's not the standard." The court commended father for coming a long way, and repeated: "[B]ut that's not the standard. And the circumstances have changed, but I cannot get to the next step and find that it's in the best interest of this child at this point today, given her age and circumstances." The court denied father's section 388 petition, granted Lori's petition

terminating her guardianship, granted Arthur's petition for sole legal guardianship, and noted mother had withdrawn her petition. Madison's contact with mother was to be monitored by Arthur "until you're provided documentation that your daughter, the mother, is fully rehabilitated and is not currently battling with drug or alcohol addiction." Lori and Arthur "have done a decent job raising this child. And I think my job isn't to interfere with their judgment." Visitation would be arranged between Arthur and father: "I'm not going to get involved." Madison could spend half her summer with Lori, and if father wanted to go to Arizona for an overnight visit with Madison, he could.

The final orders appointed Arthur as Madison's sole legal guardian, and ordered monitored visitation for mother until Arthur had evidence she was sober and rehabilitated. Father was awarded monthly unmonitored weekend visits from Friday to Sunday in Arizona, including overnights, as arranged with Arthur. Lori was awarded visitation for one half of the summer vacation as arranged with Arthur.

Father filed a timely appeal. DCFS did not file a respondent's brief. We granted mother's request for appointment of counsel, and she filed a respondent's brief.

### DISCUSSION

We review the juvenile court's denial of father's section 388 petition for an abuse of discretion, and reverse only if the court's determination was arbitrary, capricious, or absurd. (*In re Jacob P.* (2007) 157 Cal.App.4th 819, 832 (*Jacob P.*).)

"[A]lthough guardianship is a more stable solution than foster care, it is not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature. . . . [N]othing precludes a parent whose parental rights have not been

11

terminated from seeking to regain custody of their dependent minors." (*In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1215-1216.)  Father had " 'the continuing right to petition the [juvenile] court for a modification of any of its orders based upon changed circumstances or new evidence pursuant to section 388.' [Citation.]  This includes the right to petition the court to terminate guardianship." (*Id.* at p. 1216.)

At the review hearings before a permanent plan is in place, "there is a statutory presumption the child will be returned to parental custody.  [Citation.]  The presumption ceases once reunification services have terminated.  At that point it is presumed continued care is in the best interest of the child. However, the presumption may be rebutted by the parent showing circumstances have changed which would warrant further consideration of reunification." (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1086.)  At the hearing on a section 388 petition, the parent has the burden to prove by a preponderance of the evidence that there are changed circumstances that make a change in placement in the best interest of the child.  (*In re Priscilla D.*, *supra*, 234 Cal.App.4th at pp. 1216-1217.)  This is because " '[a]fter the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount.  [Citation.]  Rather, at this point, the focus shifts to the needs of the child for permanency and stability.  [Citation.] . . . A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, what is in the best interest of the child.' " (*Jacob P.*, *supra*, 157 Cal.App.4th at p. 828.)

12

The parties agree (and the court acknowledged) father showed changed circumstances. But "a parent's compliance with the case plan is not a guarantee the child will be returned to the parent," because whether "it would be in the [child's] best interests to return . . . is a separate question." (*Jacob P.*, *supra*, 157 Cal.App.4th at pp. 830-831.) That separate question is the only question before us, and we easily conclude the juvenile court did not abuse its discretion in concluding it was not in Madison's best interest to be placed in Father's custody.

Father argues he is Madison's father, and placement in his home would be more permanent and stable than guardianship with Arthur. But that is true any time a parent files a section 388 petition seeking to terminate a guardianship. He points out he and Coelina have a two-bedroom apartment where Madison could build her relationship with her two very young half-siblings; he would pick her up at school aftercare; and Coelina would be home during the summer. But that shows only that father could provide a home and appropriate care for Madison, which Arthur had provided for seven years in Arizona. Father expresses safety concerns about Madison visiting mother in Arizona. But those concerns were addressed by Arthur's full concurrence with the court's order that mother's visitation be monitored, until he had documentation his daughter was sober and fully rehabilitated.

Madison, nine years old and in Arthur's care since she was two, told the social worker she wanted to stay in Arizona with Arthur. "[A]lthough a child's wishes may be evidence of what is in [her] best interest, they cannot be dispositive." (*Jacob P.*, *supra*, 157 Cal.App.4th at p. 832.) Nevertheless, a child's expressed preference "constituted powerful demonstrative

13

evidence it would be in [her] best interest" to honor that preference. (*In re Michael D.*, *supra*, 51 Cal.App.4th at p. 1087.) And, as in *Jacob P.*, the juvenile court did not base its decision on Madison's desire to stay in Arizona but the reasons for that desire. (*Jacob P.*, at p. 832.) The home nine-year-old Madison had known for seven years was with Arthur and Lori, and she was stable and doing well. Placement with father in California would "rip this child away from her home, her community, [and] her school" and destroy that stability.

The juvenile court reminded father the standard was not his best interest, but Madison's. As our colleagues in Division Seven put it, "Appellant is looking at the facts from [his] perspective not [the child's] perspective. Appellant may have ameliorated the problem leading to dependency on [his] own, but only after [he] failed to complete the services offered by the Department. [The child] had lived with his maternal grandmother for four years and had limited contact with appellant during that time, mostly by telephone. . . . [The child] decided he preferred staying with [the maternal grandmother and guardian] after visiting appellant." (*Jacob P.*, *supra*, 157 Cal.App.4th at p. 833.) The child's twin brother was moving to Colorado to live with the appellant parent, which made this "a close question," but the court did not abuse its discretion in concluding it was not in the child's best interest to terminate the guardianship. (*Ibid.*) The question in this case is not as close.

The trial court did not abuse its discretion when it denied father's section 388 petition to have Madison returned to his care.

14

**DISPOSITION**

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



LAVIN, Acting P. J.



DHANIDINA, J.